| | | |
|---|---|---|
| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL ESPECIAL | | |
| RAFAEL AGOSTO SANTIAGO; MIRIAM VELÁZQUEZ VELÁZQUEZ y EVELYN RODRÍGUEZ SANTIAGO<br><br>Recurrentes<br><br>v.<br><br>OFICINA DE GERENCIA DE PERMISOS (OGPe) y QMC TELECOM, LLC (Concesionarios)<br><br>Recurridos | KLRA202100457 | Revisión Judicial procedente del Departamento de Desarrollo Económico y Comercio; Oficina de Gerencia de Permisos (OGPe)<br><br>Sobre: Oposición a Autorización de Permiso de Construcción para Facilidades de Telecomunicaciones<br><br>Caso Número: 2019-252363-PCOC-001980 |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Rivera Marchand y el Juez Salgado Schwarz

Domínguez Irizarry, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 29 de abril de 2024.

Los recurrentes, Rafael Agosto Santiago, Miriam Velázquez Velázquez y Evelyn Rodríguez Santiago, comparecen ante nos para que dejemos sin efecto la determinación emitida por la Oficina de Gerencia de Permisos (en adelante, OGPe) el 30 de agosto de 2021. Mediante la misma, el referido organismo declaró *No Ha Lugar* una solicitud de revisión administrativa instada por la parte recurrida, QMC Telecom, LLC (en adelante, QMC).

Por los fundamentos que expondremos a continuación, se confirma la determinación administrativa recurrida.

### I

Surge del expediente que el 9 de septiembre de 2019, QMC presentó ante la OGPe una solicitud de permiso de construcción para unas facilidades de telecomunicaciones ubicadas en la

Número Identificador

SEN2024_____

Carretera PR-183, Kilometro 17.8 interior, del Barrio Montones de Las Piedras.

Ese mismo día, los recurrentes presentaron una solicitud de intervención. No obstante lo anterior, el 24 de junio de 2020, el referido organismo expidió el permiso de construcción peticionado, sin atender el reclamo. Inconformes, los recurrentes acudieron ante este Tribunal, y plantearon que la OGPe debió atender la solicitud de intervención, antes de expedir el permiso.[1] El 29 de septiembre de 2020, emitimos una *Sentencia* en la cual dejamos sin efecto el permiso expedido y ordenamos que la agencia adjudicara la solicitud de intervención.

Según ordenado, el 16 de octubre de 2020 la OGPe atendió la petición y declaró *Ha Lugar* la referida solicitud de intervención.

Luego de varias incidencias procesales, el 19 de abril de 2021 la OGPe emitió el permiso que nos ocupa, con el número 2020-331386-PCOC-011879, el cual fue notificado a todas las partes. En el mismo, autorizó a QMC a construir la torre de telecomunicaciones propuesta.

En desacuerdo, el 3 de mayo de 2021 los recurrentes presentaron una *Solicitud de Revisión Administrativa.* En la misma, plantearon que la concesión de un permiso para la construcción de una torre de telecomunicaciones era de carácter discrecional, por lo cual, según el Artículo 8.7 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley 161-209, 23 LPRA sec. 9018f, el permiso debía contener determinaciones de hechos y conclusiones de derecho. Además, indicaron que, según la descripción detallada para el endoso a la construcción conferido por la Federal Aviation Administration (en adelante, FAA), la altura de la torre excedía los ciento ochenta (180) pies autorizados por el permiso. Igualmente,

---

[1] Caso Núm. KLRA202000327.

según se expuso, el referido endoso había expirado a la fecha de la expedición del permiso.

Por otro lado, los recurrentes indicaron que, en el terreno en el cual se propuso la construcción, se descubrieron alumbramientos de agua. Por ello, se argumentó que la agencia debía revocar el permiso y comenzar un proceso de reclasificación del terreno, con el fin de proteger los recursos hídricos allí presentes. Además, aseveraron que el proyecto propuesto cambiaría drásticamente la fisiología del terreno, lo cual significaría un riesgo para el hábitat de la Boa de Puerto Rico y del Coquí Guajón, especies que alegó, están protegidas por leyes estatales y federales. A su vez, plantearon que la torre en controversia pondría en peligro la salud de los residentes del Barrio Montones, produciría la depreciación de sus propiedades y afectaría la estética de la vecindad.

Finalmente, en su solicitud de revisión, alegaron que la covacha y la terraza de una de las recurrentes, la señora Rodríguez Santiago, quedaba a unos ciento cincuenta (150) pies aproximados de la torre de telecomunicaciones propuesta. Por ello, arguyeron que la construcción infringía el artículo 5(a) de la Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico, Ley Núm. 89-2000, 27 LPRA sec. 323, la cual requiere que una estructura de telecomunicación guarde una distancia no menor de la altura de la torre, más un diez por ciento (10%) adicional de la residencia más cercana. En virtud de lo expuesto, suplicaron a la OGPe que declarara con lugar la revisión administrativa y revocara el permiso expedido.

El 7 de mayo de 2021, los recurrentes presentaron una *Solicitud Urgente de Paralización de Obras*. Principalmente, plantearon que mientras el permiso expedido estuviese en revisión, no era final y firme, ni ejecutable. A tales efectos, solicitaron la

paralización de la obra de construcción propuesta por la parte recurrida.

El 17 de mayo de 2021, QMC presentó su *Respuesta a [la] Solicitud de Revisión Administrativa*. En cuanto al argumento presentado por la parte recurrente de que el permiso solicitado era de carácter discrecional, afirmó que los procesos de aprobación de permisos son comúnmente ministeriales mientras no se solicite una variación de los requisitos. Planteó que, en el permiso, no se solicitó una variación, por lo que no era necesario que la agencia realizara determinaciones y conclusiones de derecho al expedir el mismo.

Por otro lado, la parte recurrida aseveró que, contrario a lo expresado por la parte recurrente, no existían especies protegidas en el terreno propuesto para la construcción. Acentuó que presentó ante la OGPe un documento intitulado *Memorial para Solicitud de Certificación de Hábitats Naturales para la Vida Silvestre*, el cual dispuso expresamente que en el área del proyecto y la periferia inmediata no se observó población significativa de alguna especie de fauna, ni tampoco se encontraron especies consideradas como amenazadas o en peligro de extinción. Además, QMC acentuó que, como parte del proceso de evaluación de la propiedad, realizó consultas con diversas agencias concernidas, entre ellas, el Departamento de Recursos Naturales y Ambientales, y la División de Permisos de Medio Ambiente. Ambas agencias acreditaron que el área propuesta tenía un bajo potencial de convertirse en un hábitat de alto valor ecológico, y que no albergaba especies que requiriesen conservación.

En cuanto a las alegaciones sobre los presuntos alumbramientos de agua en el terreno a utilizarse para la construcción, QMC aseveró que eran meras alegaciones. Destacó que se realizó una investigación en el suelo propuesto, incluida como parte del expediente administrativo, la cual demostró que no

había acumulación de agua en el mismo. Igualmente, sostuvo que el argumento de que la torre de telecomunicación afectaría la estética y el valor de las propiedades era especulativo. Según expuso, las leyes aplicables no impedían la ubicación de las referidas facilidades por las antedichas razones.

En lo referente al endoso de la FAA, QMC explicó que en el endoso de la FAA se le incluyeron a la descripción de la torre diez (10) pies adicionales. Ello, dado a que, con probabilidad, los equipos a utilizarse para la construcción de la misma sobrepasarían temporalmente la altura autorizada. De otra parte, aclaró que lo cierto era que la fecha de vigencia precisada en el endoso era el 8 de octubre de 2020. Sin embargo, especificó que el referido organismo enfatizó en su determinación que, si la construcción de la torre comenzaba antes de la mencionada fecha, el mencionado endoso continuaría en vigor. Sobre ese particular, destacó que la antedicha construcción comenzó en septiembre de 2020.

Por último, la parte recurrida expresó que, aunque la Ley Núm. 89, *supra*, requiere que una torre de telecomunicación guarde una distancia mínima de la residencia más cercana, este mandato aplicaba únicamente a las residencias construidas, o que se encontraban en proceso de construcción, al momento de presentarse la solicitud de permiso. Alegó que a la fecha de la solicitud del permiso en cuestión no existía ninguna covacha o terraza en el radio de distancia requerido por la antedicha Ley. Al amparo de lo presentado, peticionó a la agencia que denegara la revisión solicitada por los recurrentes y confirmara la validez del permiso.

Evaluadas las posturas de las partes, la OGPe celebró vistas los días 4, 28 y 29 de junio de 2021, y 1 de julio del mismo año. Los recurrentes presentaron como prueba sus testimonios, así como el testimonio del agrónomo José Ramón Márquez Ruiz, quien también

era residente del Barrio Montones de Las Piedras. Según la *Resolución* dictada, el agrónomo declaró que "las fincas del sector se usaron para pastoreo[,] [por lo que] el terreno [era] 95% cayagua, con una inclinación de 15% con drenaje pobre. Por eso [era] necesario sacar el terreno para sustituirlo con uno que funcione".[2]

Además, durante las vistas de revisión, fueron presentados como exhibits varios documentos anejados por los recurrentes a una *Moción al Expediente* instada el 24 de julio de 2021. Los referidos documentos fueron identificados por estos de la siguiente manera:

a. Exhibit 1- Siete (7) fotos de construcción y terminación de covacha con terraza y baño […].

b. Exhibit 2a- Carta de objeción y no endoso del Municipio de Las Piedras al proyecto del permiso impugnado, con fecha de 11 de junio de 2019.

c. Exhibit 2b- Carta de objeción y no endoso del Municipio de Las Piedras al proyecto del permiso impugnado, con fecha de 13 de septiembre de 2019.

d. Exhibit 3- Una (1) foto de rótulo notificando solicitud de permiso y que ilustra las condiciones del suelo, en el momento de colocar el rótulo, de la finca donde se propone la obra.

e. Exhibit 4- Una (1) foto aérea de la finca donde se propone la obra, luego de comenzada la construcción, […].

f. Exhibit 5a- Documento intitulado *Registration Search Results* suscrito por la FCC (*FAA Study Number like* 2019-ASO-10205-OE).

g. Exhibit 5b- Documento intitulado *Application Search Results* suscrito por la FCC (*FAA Study Number like* 2019-ASO-10205-OE) 41.[3]

De otra parte, QMC argumentó, en esencia, que el permiso expedido cumplió con las leyes y reglamentos aplicables.

Es preciso aclarar que el organismo recurrido acreditó que en el expediente del caso obraba lo siguiente:

a. Una Determinación de Cumplimiento Ambiental para Evaluación Ambiental, aprobada el 28 de marzo de 2019.

---

[2] Véase, Determinación de hecho número 29 de la *Resolución Administrativa*, apéndice del alegato de la parte recurrida, pág. 134.
[3] Íd.*,* Determinación de hecho número 40, pág. 136.

    b. Comentarios de la División de Medioambiente de la OGPe emitidos el 10 de enero de 2019, en el caso número 2018-250423-SRM-021578, indicando: "La División de Permisos de Medioambiente de la Oficina de Gerencia de Permisos realizó una búsqueda en el Sistema de Información Geográfica (GIS) de la Junta de Planificación y no encontró en el área de la actividad propuesta hábitat crítico, elementos críticos ni área de Prioridad de Conservación. La División de Medioambiente no tiene objeción al proyecto propuesto".

    c. *Determination of No Hazard to Air Navigation*, notificada por la Federal Aviation Administration el 8 de abril de 2019.

    d. Comunicación del Negociado de Telecomunicaciones de PR (NETPR) del 22 de octubre de 2019, la parte concesionaria informa que él añadió sus comentarios a la Recomendación de Evaluación Ambiental, bajo el caso número 2019-352363-REA-002980, expedida el 22 de febrero de 2019, en donde indica que no tienen objeción al proyecto.

    e. Comunicación de la Oficina Estatal de Conservación Histórica, con fecha de 16 de agosto de 2017, en la cual indica que no se afectan propiedades históricas.

    f. Comunicación del Instituto de Cultura Puertorriqueña, Programa de Patrimonio Histórico Edificado, con fecha de 24 de enero de 2019, en la cual indica que la construcción no implica impacto adverso a recursos culturales pertenecientes al patrimonio histórico edificado, por lo cual no tienen objeción al mismo.

    g. Comunicación del Instituto de Cultura Puertorriqueña, Programa de Arqueología y Etnohistoria, con fecha de 18 de enero de 2019, en la cual indica que no tienen objeción al proyecto.

    h. Certificación de Notificación a Vecinos dentro del radio de 100 metros.

    i. Declaración Jurada suscrita el 17 de septiembre de 2019.

    j. Copia de los edictos publicados en el periódico El Nuevo Día los días 12 y 13 de septiembre de 2019.[4]

Examinado lo anterior, la agencia emitió la *Resolución de Revisión Administrativa* que nos ocupa. En el referido dictamen, concluyó que, según el expediente y la prueba presentada durante las vistas, el permiso de construcción expedido cumplió con las

---

[4] Íd., Determinaciones de hecho número 6-9, pág. 130. (Énfasis nuestro).

disposiciones legales y reglamentarias aplicables. Enfatizó que los argumentos de la parte recurrente se basaron en la percepción. Particularmente, la OGPe destacó que estos no mostraron evidencia que contradijera lo propuesto por QMC. Consecuentemente, la agencia declaró *No Ha Lugar*, la *Solicitud de Revisión Administrativa.*

En desacuerdo, los recurrentes acudieron ante nos mediante el presente recurso. Esencialmente, plantearon que la agencia debió revocar el permiso impugnado, puesto que: (1) era nulo de su faz por no contener determinaciones de hecho y de derecho; (2) el estudio aeronáutico de la FAA expiró antes de que la OGPe expidiera del permiso que nos ocupa, y (3) la altura propuesta para la torre de telecomunicaciones pondría en riesgo la vida, la salud, seguridad y bienestar de los residentes del Barrio Montones. A su vez, sostuvieron que la agencia debió paralizar la construcción de la torre.

El 10 de septiembre de 2021, QMC presentó ante este Tribunal su alegato en oposición. En el escrito, adujo que el permiso impugnado fue autorizado mediante una solicitud ministerial, por lo que no era necesario que se incluyeran determinaciones de hecho y conclusiones de derecho. Por otra parte, reiteró que, aunque la fecha de vigencia del endoso de la FAA era hasta el 8 de octubre de 2020, la construcción de la torre comenzó antes de que venciera el mismo. A su vez, sostuvo que la facilidad de telecomunicaciones propuesta cumplía con la altura y la distancia requerida por las leyes y reglamentos aplicables para garantizar la seguridad de las personas que residen cerca de la torre. En cuanto a la solicitud de paralización de obras, expuso que la presentación de un recurso de revisión no paraliza el permiso otorgado.

Evaluadas las posturas de las partes, el 11 de febrero de 2022 emitimos un dictamen mediante el cual revocamos la resolución administrativa recurrida, al amparo de lo resuelto por el Tribunal

Supremo en *Aequitas, LLC v. Junta de Planificación*, CC-2020-00320[5] y *Comité Pro-Seguridad ARRAQ y ARESPA y su presidenta Vanessa D. Ríos Grajales v. Junta De Planificación*, CC-2021-0296[6], sobre la nulidad de los Reglamentos Conjuntos 2019 y 2020, respectivamente. Ahora bien, nuestra determinación fue objeto de revisión ante el Tribunal Supremo, y mediante una *Sentencia*, emitida el 16 de junio de 2023, concluyó que los referidos reglamentos se consideran nulos de manera prospectiva. Por otra parte, aclaró que la mencionada nulidad no invalidó el permiso ante nuestra consideración. Al amparo de ello, ordenó a esta Curia a atender en los méritos el presente recurso.

Luego de examinar nuevamente el expediente ante nuestra consideración, y con el beneficio de la comparecencia de las partes procedemos a expresarnos.

## II

### A

La Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley 161-2009, 23 LPRA secs. 9011 *et seq.*, se promulgó con el propósito de establecer un marco legal y administrativo para regir toda solicitud, evaluación, concesión y denegación de permisos por parte del Gobierno de Puerto Rico. *Véase,* Exposición de Motivos de la Ley Núm. 161, *supra.* El referido cuerpo normativo contempla dos tipos de permisos: (1) los ministeriales, los cuales no requieren un juicio subjetivo, y (2) los discrecionales, que sí conllevan un juicio subjetivo sobre la forma en que se conduce o se propone una actividad o acción. Art. 1.5 (26) y (48), 23 LPRA sec. 9011.

En cuanto a los permisos ministeriales, el funcionario autorizado meramente aplicará los requisitos exigidos por las leyes y reglamentos a los hechos presentados. No podrá utilizar su juicio

---

[5] Caso Núm. KLRA201900413.
[6] Caso Núm. KLRA202100044.

personal para determinar si una actividad debe ser realizada o de qué manera será ejecutada. Su determinación únicamente será basada en estándares objetivos, como, por ejemplo, si el uso es permitido en la propiedad bajo los distritos de calificación aplicables, si cumple con los requisitos de edificabilidad, y si el solicitante pagó el cargo aplicable y presentó los documentos requeridos. *Íd.*, Art.1.5 (48). Así, en las solicitudes ministeriales no será necesario incluir determinaciones de hecho y conclusiones de derecho. Art. 7.8 de la Ley Núm. 161, *supra.*, 23 LPRA sec. 9018f.

Mientras que, en los permisos discrecionales, se espera que la entidad competente utilice su conocimiento especializado, discreción y juicio para llegar a una determinación. Sus conclusiones no pueden depender solamente de estándares fijos. Art. 1.5 (26) de la Ley Núm. 161, *supra.* Por ello, en toda determinación final de una solicitud discrecional se deberán exponer las determinaciones de hecho y conclusiones de derecho que la fundamenta. Art. 7. 8 de la Ley Núm. 161, *supra.* El organismo responsable de atender las solicitudes discrecionales es la Junta Adjudicativa de OGPe, la cual se creó con el fin específico de evaluar y adjudicar las mismas. Art. 6.1 de la Ley Núm. 161, *supra*, 23 LPRA sec. 9016e. Para ello, la Ley Núm. 161, *supra*, le confirió la facultad de celebrar vistas públicas y determinar la procedencia de una modificación o condición para la aprobación de una solicitud. Art. 6.3 de la Ley Núm. 161, *supra*, 23 LPRA sec. 9016g.

A los fines de resolver este caso, subrayamos que, según el Reglamento Conjunto de 2019, en las únicas dos instancias en las cuales una solicitud de permiso para la construcción de una torre de comunicaciones es de carácter discrecional es cuando se solicita una variación de los requisitos ordinarios o cuando se trata de una zona ecológicamente sensitiva. Ello, puesto que, en ambas

instancias, se requiere la celebración de vistas públicas, las cuales son competencia de la Junta Adjudicativa. *Véase*, Secs. 9.11.2.2 (d) y 9.11.10 (e) del Reglamento Conjunto del 2019, *supra.* A tales efectos, las antedichas solicitudes requerirán determinaciones de hecho y conclusiones de derecho.

**B**

Por otra parte, la Ley Núm. 161, *supra*, creó la Oficina de Gerencia de Permisos (OGPe) para que, a través de esta, se emitan determinaciones finales, permisos, licencias, certificaciones, autorizaciones y cualquier trámite necesario o que incida en la operación de un negocio en Puerto Rico, según se disponga en el Reglamento Conjunto de Permisos.  23 LPRA sec. 9012d.  Conforme a ello, el Artículo 15.1 del antedicho estatuto, dispone que se preparará y adoptará un Reglamento Conjunto para, entre otros propósitos, establecer un sistema uniforme de adjudicación que atienda la evaluación y expedición de determinaciones finales, permisos y recomendaciones relacionados a obras de construcción y al uso de terrenos. 23 LPRA sec. 9025.

A tales efectos, se aprobó el Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, Reglamento Núm. 9081 del 7 de mayo de 2019 (Reglamento Conjunto de 2019).[7] El Capítulo 9.11 del Reglamento Conjunto de 2019, *supra*, versa sobre la concesión de permisos para proyectos de construcción, instalación y ubicación de torres e instalaciones de telecomunicaciones. El mencionado capítulo incorporó a su cuerpo reglamentario la mayoría de las exigencias previamente delineadas por la Ley sobre la Construcción, Instalación y Ubicación de Torres de

---

[7] Precisa señalar que el Reglamento Conjunto de 2019 aplica a la controversia presentada en este caso al amparo de *Martínez Fernández et al. v. OGPe et al.*, 2023 TSPR 75, 212 DPR ___ (2023). En el mismo, se concluyó que el mencionado Reglamento era nulo de manera prospectiva.

Telecomunicaciones de Puerto Rico, Ley Núm. 89-2000, 27 LPRA sec. 321 *et seq.,* y el Reglamento para Proyectos de Construcción, Instalación y Ubicación de Torres y Facilidades de Telecomunicaciones, Reglamento Núm. 6721 del 14 de noviembre de 2003, el cual fue promulgado en virtud del mandato de la Ley Núm. 89, *supra.*

Precisa destacar que la Ley Núm. 89, *supra,* se promulgó con dos propósitos: (1) atender la necesidad de que exista cobertura de las distintas compañías de telecomunicaciones a través de todo Puerto Rico, y (2) armonizar los intereses comerciales con el de los ciudadanos de modo que se logre una convivencia sana y una mejor calidad de vida. Art. 3 de la Ley Núm. 89, *supra,* 27 LPRA sec. 321.

A esos fines, la Ley Núm. 89, *supra,* requiere que la construcción de toda torre de telecomunicaciones, en un distrito residencial o rural, guarde una distancia no menor de la altura de la torre, más un diez por ciento (10%) adicional de la residencia más cercana. Ahora bien, el mencionado requisito no será de aplicación si el incumplimiento fue creado por desarrollos posteriores autorizados por la Junta de Planificación. Art. 5, 27 LPRA sec. 323. Por otra parte, si la torre a construirse alberga estaciones de transmisión de frecuencia radial para fines comerciales, el proponente deberá acreditar mediante una declaración jurada: (1) que la antena será construida con el propósito de coubicar antenas de varias compañías, (2) que es absolutamente necesario ubicar la torre en ese sector, y (3) las gestiones realizadas y sus resultados para ubicar sus estaciones de transmisión de frecuencia radial en torres que no sean de su propiedad, que estén dentro del sector en que se solicita el permiso y que puedan alcanzar la cobertura deseada, conforme a la estación de frecuencia radial que se pretenda instalar. Art. 7 de la Ley Núm. 89, *supra,* 27 LPRA sec. 325.

De otra parte, el Reglamento Núm. 6721, *supra,* exige que las estructuras y equipos que formen parte de la torre estén en armonía con la altura determinada por la FAA. A tales efectos, el proponente deberá presentar un endoso de la mencionada agencia ante la Junta de Planificación o la Administración de Reglamentos y Permisos. Sec. 501. Además, el Reglamento Núm. 6721 requiere, como parte del proceso de evaluación para la instalación y ubicación de las torres de telecomunicaciones, que se obtengan comentarios del Departamento de Recursos Naturales y Ambientales; quien, a su vez, recomendará las medidas de mitigación correspondiente. *Íd.,* Sec. 302 (c).

## C

Por otro lado, es preciso señalar que, de ordinario, un recurso de revisión administrativa no suspende una determinación final de la OGPe.[8] Ello, puesto que, como regla general, existe una presunción *juris tantum* de corrección y legalidad de las determinaciones finales emitidas por la referida agencia. Sec. 11.4.1.7 (a), Reglamento Conjunto de 2019, *supra.* Ahora bien, si existe prueba suficiente para rebatir la antedicha presunción, o si se demuestra que una construcción presenta un peligro grave, inminente e inmediato a la salud, la seguridad de las personas o del medio ambiente, el referido organismo podrá decretar la paralización de una obra. *Íd.,* Sec. 11.4.1.7 (b) y 11.4.1.5; Artículo 14.3 de la Ley Núm. 161, *supra,* 23 LPRA sec. 9024b.

## D

Finalmente, sabido es que es norma firmemente establecida en el estado de derecho vigente, que los tribunales apelativos están llamados a abstenerse de intervenir con las decisiones emitidas por

---

[8] Véase Regla 5 del Reglamento de Procedimientos Adjudicativos de la División de Reconsideración de Determinaciones Finales de la OGPe, Reglamento Núm. 8457 de 24 de marzo de 2014; Art. 11.5 de la Ley Núm. 161, 23 LPRA sec. 9021q.

las agencias administrativas, todo en deferencia a la vasta experiencia y conocimiento especializado que les han sido encomendados. *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 35 (2018); *The Sembler Co. v. Mun. de Carolina,* 185 DPR 800, 821-822 (2012); *Asoc. Fcias. v. Caribe Specialty II,* 179 DPR 923, 940 (2010). En este contexto, la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, establece el alcance de la revisión judicial respecto a las determinaciones administrativas. A tal efecto, la referida disposición legal expresa como sigue:

> El Tribunal podrá conceder el remedio apropiado si determina que el recurrente tiene derecho a un remedio.

> Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo.

> Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal.

> 3 LPRA sec. 9675.

Al momento de revisar una decisión agencial, los tribunales deben ceñirse a evaluar la *razonabilidad* de la actuación del organismo. *Rolón Martínez v. Supte. Policía,* supra; *The Sembler Co. v. Mun. de Carolina,* supra. Por ello, los tribunales no deben intervenir o alterar las determinaciones de hechos que emita, siempre que estén sostenidas por *evidencia sustancial* que surja de la *totalidad del expediente administrativo.* *Otero v. Toyota,* 163 DPR 716, 727-728 (2005); *Pacheco v. Estancias,* 160 DPR 409, 431-432 (2003). Nuestro Tribunal Supremo ha definido el referido concepto como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Rolón Martínez v. Supte. Policía,* supra; *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* 144 DPR 425, 437 (1997). Por tanto, la parte que impugne la legitimidad de lo resuelto por un organismo administrativo tiene

el peso de demostrar que existe otra prueba que justifica derrotar la presunción de corrección y regularidad que les asiste. *OEG v. Martínez Giraud*, 210 DPR 79, 89 (2022); *Graciani Rodríguez v. Garage Isla Verde*, 202 DPR 117, 128 (2019); *González Segarra v. CFSE*, 188 DPR 252, 277 (2013).

A tenor con esta norma, los foros judiciales limitan su intervención a evaluar si la decisión de la agencia es razonable y no si hizo una determinación correcta de los hechos ante su consideración. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* supra. En caso de que exista más de una interpretación razonable de los hechos, el tribunal debe sostener lo concluido por la agencia, evitando sustituir el criterio del organismo por sus propias apreciaciones. *Pacheco v. Estancias,* supra. Ahora bien, esta norma de deferencia no es absoluta. La misma cede cuando está presente alguna de las siguientes instancias: (1) cuando la decisión no está fundamentada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la apreciación de la ley, y; (3) cuando ha mediado una actuación irrazonable, o ilegal. *Costa Azul v. Comisión de Seguridad*, 170 DPR 847, 853 (2007).

**III**

En el presente caso, tal cual detallado, los recurrentes nos solicitan que revisemos la negativa de la OGPe de revocar un permiso para la construcción de una torre de telecomunicaciones, solicitado por QMC. Esencialmente, sostienen que la solicitud presentada por la parte recurrida era de carácter discrecional, por lo que el permiso expedido debió contener determinaciones de hechos y conclusiones de derecho. A su vez, alegan que la referida petición no cumplió con las exigencias de las leyes y reglamentos aplicables. Finalmente, plantean que la agencia concernida debió paralizar la construcción de la torre de comunicaciones.

Luego de revisar detenidamente el expediente ante nuestra consideración, nos resulta forzoso confirmar la resolución recurrida.

En cuanto al planteamiento de los recurrentes, en el cual argumentan que el permiso expedido por la OGPe para la construcción debió contener determinaciones de hecho y conclusiones derecho, colegimos que la solicitud presentada por QMC fue una de carácter ministerial, por lo que no tenía que cumplir con el antedicho requerimiento. Ello, puesto que nada en el expediente nos sugiere que QMC solicitó una variación o que el terreno propuesto para la construcción era un área ecológicamente sensitiva. Son estas últimas dos instancias cuando único se entenderá que se atiende una solicitud discrecional, dado a que se requiere la intervención de la Junta Adjudicativa para la celebración de vistas públicas, quien es el organismo designado para atender una petición discrecional.

Por otra parte, los recurrentes señalan que el endoso de la FAA venció antes de que la OGPe expidiera el permiso que nos ocupa. A pesar de que el referido endoso detalla que su fecha de expiración era el 8 de octubre de 2020, aclara más adelante que el endoso continuará en vigor si "*the construction is started (not necessarily completed)*".[9] Según el testimonio de la parte recurrida, la construcción comenzó en septiembre de 2020.[10] A tales efectos, concluimos que cuando la OGPe autorizó la construcción en cuestión, el endoso de la FAA estaba vigente.

Los recurrentes plantean, además, que la altura y la distancia de la torre pone en riesgo su salud, seguridad y bienestar. Al examinar el señalamiento sobre la altura exigida, apreciamos que los reglamentos aplicables únicamente exigen que la torre esté en

---

[9] Apéndice del recurso, pág. 19
[10] Determinación de hecho número 34 de la *Resolución Administrativa*, apéndice del alegato de la parte recurrida, pág. 134.

armonía con la altura determinada por la FAA, y que el proponente presente un endoso de la mencionada agencia ante la Junta de Planificación o la Administración de Reglamentos y Permisos. Sec. 501 de Reglamento Núm. 6721, *supra*. Surge del expediente administrativo que, el 8 de abril de 2019, la referida agencia expidió un endoso a favor de QMC, el cual acreditó que la estructura propuesta no implicaba un peligro para la navegación aérea.

En cuanto a la distancia de la torre, los recurrentes alegan, particularmente, que QMC incumplió con las disposiciones de la Ley Núm. 89, *supra*, porque la terraza y una covacha construida por la señora Rodríguez Santiago se encuentra a ciento cincuenta (150) pies aproximados de la torre en cuestión. Sin embargo, según reseñamos anteriormente, la distancia mínima requerida no será de aplicación si el incumplimiento fue creado por desarrollos posteriores. Art. 5 de la Ley Núm. 89, *supra*. La agencia concernida determinó que, según la evidencia, la recurrente inició la construcción de la covacha, a la cual posteriormente se le añadió un techo para convertirla en terraza, luego de QMC presentar la solicitud de permiso. A su vez, destacó que, al día de la vista administrativa, no había presentado evidencia de que la referida covacha contara con un permiso de construcción.[11] Ante lo expuesto, y en virtud de que los recurrentes no presentaron prueba en contrario que demostrara que las determinaciones de la agencia fueron irracionales o sin fundamento, concluimos que la altura de la torre y su distancia de las residencias cercanas cumplen con los requerimientos de las leyes y reglamentos aplicables, y no ponen en riesgo a los recurrentes.

---

[11] *Resolución Administrativa*, apéndice del alegato de la parte recurrida, pág. 140.

Por otro lado, los recurrentes plantean que, dado a que la construcción atentaba contra su salud y bienestar, el organismo recurrido debió paralizar la obra. Según apuntalamos, la OGPe podía decretar la paralización si se demostraba que la construcción presentaba un peligro grave, inminente e inmediato a la salud, la seguridad de las personas o del medio ambiente, cosa que en este caso no ocurrió. Artículo 14.3 de la Ley Núm. 161, *supra*, 23 LPRA sec. 9024b. Igualmente, señalamos que la mera presentación un recurso de revisión administrativa no suspende una determinación final de la OGPe. Sec. 11.4.1.7 (a), Reglamento Conjunto de 2019, *supra*.

Otro argumento que los recurrentes esbozan es que la construcción de la torre propuesta pondría en riesgo el hábitat de la Boa de Puerto Rico y el Coquí Guajón. Sin embargo, estos señalamientos carecen de evidencia que los sustente. Durante las vistas de revisión celebradas por la agencia, estos primordialmente prestaron sus testimonios para validar sus alegaciones. Únicamente presentaron como perito al agrónomo Márquez Ruiz, quien, según lo que consta en el expediente, no aportó nada que controvirtiera la prueba documental presentada por QMC, de manera que sustentaba lo contrario. Hacemos énfasis en el *Memorial para Solicitud de Certificación de Categorización de Hábitats Naturales para la Vida Silvestre*, preparado por el agrónomo José García Morales, el cual indica que el terreno propuesto para construir la torre no tenía proximidad con áreas sensitivas, ni conectividad directa con algún área que se considere como hábitat esencial o crítico. Igualmente, en el aludido memorial se destaca que la variedad de flora y fauna eran pobres, y que no se encontraron especies consideradas como amenazadas o en peligro

de extinción.[12] Además, QMC incluyó con su solicitud de permiso una *Certificación para Categorización de Hábitats Naturales para Vida Silvestre* emitida por el Departamento de Recursos Naturales y Ambientales (DRNA) la cual señala que en el predio no había reportes de especies amenazadas o en peligro de extinción. Por ello, el DRNA categorizó la porción del predio como un hábitat natural con bajo potencial de convertirse en hábitat esencial.[13] Además, del expediente administrativo surgen unas *Recomendaciones de Medioambiente* preparadas por el Departamento de Desarrollo y Comercio de la OGPe, en las cuales se reseña que, luego de realizada una búsqueda en el predio de la actividad propuesta, no se encontró un hábitat crítico, elementos críticos, ni áreas de prioridad de conservación.[14] Ahora bien, aunque la parte recurrente, también presentó ante la OGPe una Carta del *Fish and Wildlife Service* expedida por el Departamento Interior de los Estados Unidos, la cual acreditó que el área propuesta estaba cerca del hábitat de la Boa de Puerto Rico, la referida agencia no presentó objeciones a la construcción de la torre.

Por último, en cuanto a la alegación sobre el presunto alumbramiento de agua en el predio, destacamos que del expediente administrativo surge que QMC anejó a su solicitud de permiso un reporte intitulado *Geotechnical Investigation Report for Proposed Telecomunicactions Tower,* preparado por el ingeniero Juan F. Mejías López. El mismo establece que: "[t]he groundwater table (GWT) at the site was encountered during drilling operation at a dept of about twenty-three (23) feet below existing ground surface at the time of drilling"[15], lo cual derrota su argumento.

---

[12] Anejo 2 del apéndice del alegato de la parte recurrida, págs. 25-30.
[13] Anejo 3 del apéndice del alegato de la parte recurrida, págs. 31-32.
[14] Anejo 4 del apéndice del alegato de la parte recurrida, págs. 33-35.
[14] Anejo 7 del apéndice del alegato de la parte recurrida, págs. 82-85.
[15] Anejo 8 del apéndice del alegato de la parte recurrida, pág. 96.

Reiteramos que, quien cuestione lo resuelto por un organismo administrativo tendrá el peso de demostrar con prueba clara robusta y convincente que existe otra prueba que justifica derrotar la presunción de corrección y regularidad que les asiste. *OEG v. Martínez Giraud*, supra, pág. 89; *Graciani Rodríguez v. Garage Isla Verde*, supra, pág. 128; *González Segarra v. CFSE*, supra, pág. 277. En el presente caso los recurrentes no presentaron prueba para sustentar sus alegaciones. A tales efectos, concluimos que la OGPe no incidió al autorizar el permiso recurrido.

**IV**

Por los fundamentos que anteceden, se confirma la resolución administrativa recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal. La Juez Rivera Marchand disiente por escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

| | | |
|---|---|---|
| RAFAEL AGOSTO SANTIAGO; MIRIAM VELÁZQUEZ VELÁZQUEZ y EVELYN RODRÍGUEZ SANTIAGO Recurrentes<br><br>v.<br><br>OFICINA DE GERENCIA DE PERMISOS (OGPe) y QMC TELECOM, LLC (Concesionarios) Recurridos | KLRA202100457 | Revisión Judicial procedente del Departamento de Desarrollo Económico y Comercio; Oficina de Gerencia de Permisos (OGPe)<br><br>Sobre: Oposición a Autorización de Permiso de Construcción para Facilidades de Telecomunicaciones<br><br>Caso Número: 2019-252363-PCOC-001980 |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Rivera Marchand y el Juez Salgado Schwarz

## VOTO DISIDENTE DE LA JUEZA RIVERA MARCHAND

En San Juan, Puerto Rico, a 29 de abril de 2024.

Respetuosamente disiento de la determinación mayoritaria.

La Ley Número 89-2000 conocido como *Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones,* según enmendada (27 LPRA sec. 321 y ss) propende a un balance de intereses, entre la regulación de la construcción de torres de telecomunicaciones, la seguridad y los derechos de los ciudadanos. Véase, además, *Mun. de San Sebastián v. QMC Telecom,* 190 DPR 652, 666. De la Exposición de Motivos de la Ley 89-2000 surge que, no se puede limitar ni menoscabar el reclamo de personas y comunidades sobre la seguridad de sus propiedades y su salud personal ante estos tipos de torres de telecomunicaciones. Cónsono con lo anterior, el Tribunal Supremo interpretó el alcance de la palabra "seguridad". Dispuso y citamos: "[p]or otro lado, al hablar de *seguridad* nos referimos necesariamente al *riesgo* de un daño que en mayor o menor grado sea real, pues nadie razonablemente busca protección de aquello

que no tiene la posibilidad de producirnos un perjuicio." *Mun. de San Sebastián v. QMC Telecom*, supra, pág. 683. Añádase a ello que, del historial del estatuto surge y citamos: "Propósito. El art. 3 de la Ley de Junio 6, 2000, Núm. 89, dispone (a) [...](b) [...](c) "La proliferación de torres que albergan antenas en zonas urbanas o en las cercanías de residencias crea desasosiego y temor por la seguridad y vida de dichos titulares y requiere de legislación que armonice los intereses comerciales con el de los titulares y requiere de legislación que armonice los intereses comerciales con el de los ciudadanos de modo que se logre una convivencia sana y una mejor calidad de vida.[...]". Lo antes, para evitar la proliferación de torres en la Isla y salvaguardar la seguridad.

Dentro del contexto expuesto, en el referido estatuto especial y su jurisprudencia interpretativa, reitero[1] mi postura de que, los permisos para torres de telecomunicaciones no son de fácil verificación y constituidos por la vía ministerial. Nos encontramos ante un permiso de naturaleza discrecional que, según dispone la normativa expuesta, requiere de un análisis subjetivo, toda vez que, exige realizar un balance entre los intereses de la comunidad donde se ubicará la torre y el desarrollo de telecomunicaciones, en aras de salvaguardar la seguridad de la comunidad. Ello, necesariamente resulta ser una determinación más amplia e intrínseca, en distinción a las consideraciones atinentes al permiso ministerial las cuales son basadas en estándares objetivos de fácil verificación. A esos efectos, para el permiso discrecional se hace necesario que se consignen determinaciones de hecho y derecho. No hacerlo propende a que se evada la revisión judicial y al acceso a la justicia, trastocando así el fin de nuestro ordenamiento administrativo.

---

[1] Véase además Recurso KLRA2021000084 cuyo *Mandato* fue expedido el 21 de julio de 2021.

Ciertamente coincidimos con la mayoría en que, los reglamentos correspondientes a la materia incluyen referencia al proceso discrecional cuando trata de vistas públicas para las solicitudes de permisos que requieran variaciones, consultas de ubicación, o por encontrarse en áreas ecológicamente sensitivas. Ahora bien, al aplicar las reglas de hermenéutica legal, se desprende que, lo antes no es una lista taxativa. De un análisis integrado de los estatutos, reglamentos administrativos e intención legislativa de las leyes especiales establecidas, en atención a la proliferación de torres, resulta que la intención legislativa no impide que el proceso de permisos de torres de telecomunicaciones sea atendido por la vía discrecional.

La hermenéutica legal, al igual que las reglas que la rigen, se utiliza no solamente en la interpretación de estatutos, sino también en la de los contratos, testamentos, reglamentos administrativos y cualquier otro documento. R. Elfren Bernier y J. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. JTS, 1987, Vol. I, pág. 241. (Énfasis suplido.) Véase, además, *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 717, 738 (2012). Al sumergirse a esta tarea, el Poder Judicial tiene como norte que de todas las reglas de interpretación hay solo una que es absolutamente invariable y esta es que "debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo." *IFCO Recycling v. Aut. Desp. Sólidos*, supra, citando a Elfren Bernier y Cuevas Segarra, *op. cit.*, pág. 242.

Luego de un análisis sosegado del recurso, con particular atención a la intención legislativa de la ley especial sobre la construcción de torres de telecomunicaciones, soy de la opinión que, nos encontramos ante un permiso de naturaleza discrecional que, según dispone la normativa antes expuesta, requiere para su

finalidad, la consignación de determinaciones de hecho y derecho.

Por ello, respetuosamente disiento.


**MONSITA RIVERA MARCHAND**
**JUEZA DE APELACIONES**